The United States Court of Appeals for the Ninth Circuit is now in session. You may be seated. Good afternoon. Before we proceed with oral arguments, on behalf of Judge McEwen and myself, I want to greet our old friend, Judge Jane Rastani, from the Court of International Trade. She has given up her time to come out and help us out in the Ninth Circuit, as she has so many times before, and it's great to see you again, Jane. Thank you very much. With that, we'll proceed to the first case on the oral argument calendar, which is Transgender Law Center v. Immigration and Customs Enforcement, et al. Ms. Lacks? Good afternoon, Your Honors, and may it please the Court. Irene Lacks with the firm Grant & Eisenhoffer, on behalf of the appellants, the Transgender Law Center, and Jolene Youngers, who are the FOIA requesters in this matter. With the Court's permission, I would like to reserve three minutes for rebuttal. This case is about the government's transparency and the district court's failure to hold the government accountable to the standards that the FOIA requires. Here, the documents appellants seek relate to the tragic in-custody death of Roxana Hernandez, a transgender asylum seeker that died while in ISIS custody. But we are here today because the district court erroneously held that the government met its obligations under the FOIA, when the record clearly shows that the government did not. Our brief set out the numerous issues and errors that the district court made in its decision, but with Your Honors' permission, I would like to focus on two main issues. First, the district court ignored and failed to consider numerous examples of how the agencies conducted a flawed search process, which overlooked new search locations and also improperly shifted the government's burden under the FOIA to the requesters. Second, the district court either wholesale ignored or dismissed without proper basis issues we raised with the agency's withholdings, including the failure to reasonably segregate information, explain duplicate determinations, and their reliance without proper justification on various FOIA exemptions. As a result, the requesters here were burdened with showing the government where to look for its own documents or when to release information that it improperly withheld. This is not what the FOIA requires. Turning to my first point, the district court should be reversed because the government's search process was patently flawed. The record shows that the agencies delayed and resisted our FOIA requests at every turn and refused to search custodians, these are new search locations that we identified, and continued to uncover relevant documents when we showed them where to look for them. And the substance of those documents also shows that critical areas related to Roxana and her debt are missing. But the district court ignored these numerous examples of overlooked materials, which also resulted in improperly shifting the government's burden of search adequacy onto the appellants. With regard to the adequacy of the search, I know that a number of circuits have adopted the beyond material doubt, as have a number of district courts. And although we've hinted at it, it hasn't been adopted directly in the Ninth Circuit. Would application of that standard make any difference here in your view? No, Your Honor. We believe that search adequacy has been shown under whether you have a different standard or not, a lower standard or not, but we do believe that the beyond material doubt standard is the appropriate standard to reach because this circuit has relied on that standard in Zemanski, which directly relies upon Weisberg, which is the D.C. Circuit case from 1983. And that circuit case clearly articulates that in the FOIA litigation context, the summary judgment standard should be viewed as the agency must show beyond a material doubt that it has conducted a search reasonably calculated to uncover all relevant documents. And the government definitely has not satisfied that burden here. Weisberg also specifically articulates what a FOIA requester must show in contrast when it states, and I'm quoting, a FOIA requester merely has to offer some reason to think that the agency might find responsive documents if it made the effort to conduct a thorough search. Can you tell me why is that a good test or a good standard in this area? It's a little strange. It seems unique to this. And why is it a good standard for these kinds of cases? Yes, Your Honor. It's an important and appropriate standard here because of the specific context of FOIA litigation. In FOIA cases, the government is able to have a case disposed of based on its affidavits alone, where those affidavits are reasonably detailed and made in good faith, but that's also without any depositions or other further discovery. And this is unique to the FOIA context. So that makes this standard of a beyond a material doubt especially important in the FOIA context, where you have cases that are usually decided on summary judgment. It's also important here because of the informational asymmetry that underpins the FOIA statute, and it's expressly recognized by the circuit in Weiner v. FBI, where it's recognized that the government knows its records, the public doesn't, so this informational asymmetry places the burden on the government to satisfactorily justify beyond a material doubt that its searches were reasonable. And Weisberg explicitly articulates this. Weisberg acknowledging that the summary judgment standard in FOIA cases is longstanding and well-established, following that states the agency bears the burden of showing there is no genuine issue of material fact, even when the underlying facts are viewed in the light most favorable to the requester, and then says what the agency must show beyond a material doubt is that it has conducted a search reasonably calculated to uncover all relevant documents. So the summary judgment standard as expressed in the FOIA context is the beyond a material doubt standard as articulated by Weisberg. I'm interested to know the precise remedy you speak, because there is a certain circularity as you recognize or the briefs recognize when you say was it reasonably calculated, was there a reasonable search, and then the government comes forward with the affidavits. But then we have three different or three and a half different exemptions that are invoked here, plus the segregability issue. Are you asking us to remand to the district court for all of the documents you've identified or some? What is the precise remedy that the Transgender Law Center is asking us? We're asking for remand on all the issues that we've identified. I don't believe it's specific to documents, but the district court here erred in both not only an incorrect standard to determine summary judgment, but also in determining search adequacy. And then, yes, for the documents that we've identified specifically, but also generally speaking, our argument is that the withholdings made here and as articulated in the agency's bond indices are inappropriate. They use boilerplate repeated language, which is clearly evident from the clear language of their bond indices, and that's across multiple documents that aren't the same document in some instances. So it's a broader error than just the documents identified. Well, let me just throw out an example to understand the scope of your argument. The deliberative process exemption, for example, and there was a series of draft press releases, which I take it were not disclosed. But the final press release obviously was. Why couldn't the interim drafts be part of the deliberative process as to what and how to say something? There's a few reasons here, Your Honor. First of all, the district court erred and the government erred in failing to articulate the broader context that invokes the deliberative process privilege here. So we don't know precisely what deliberative process is involved, and then we can't judge from that if these documents are pre-decisional. So these drafts that were withheld by the agencies merely because they're in draft form is not the test, and that's what the district court found, which was an error. Drafts are not per se shielded. That's articulated by the Supreme Court in Sierra Club, which the agencies rely upon. But what we have to actually look at is the administrative process that generated these documents and the function that these documents play, including the press releases and including other examples like the mortality review and the detainee death review. But also on top of that, there's also the issue, as Your Honor mentioned, about the reasonable segregability of these documents. The district court just wholesale adopted representations made by the defendants, and we raised issues about the invocation of these exemptions, especially when you withhold material in its entirety. And so the district court had an independent obligation to look at these materials and see at the very least if they were reasonably segregable, which the district court here did not do, and this court has determined that that is per se reversible error to fail to make such a finding. Does that mostly apply to the guidelines versus techniques documents? The reasonable segregability, Your Honor? Yeah. I don't think it applies to any document that it has redactions or is withheld in its entirety. The guidelines and techniques, the agencies invoked Exemption B-7E, and there it's especially problematic because the district court erroneously held that all of the withholdings the agencies made pursuant to this exemption were a technique or procedure. When the agencies themselves represent that some of the withholdings may have been guidelines, which require a higher standard, the circumvention of law to withhold. So there it's a reasonable segregability analysis is definitely at play, but more so the analysis that the district court undertook is incorrect based upon the fact that there are guidelines withheld. And also we show that there are improper redactions made pursuant to B-7E, which rebuts the presumption of good faith given to the agencies because from the core civic documents, we saw the redacted information and we knew it was neither a guideline, a technique, or procedure, like in Roxana's credible fear interview or in discussing Roxana's I-213 form. And also if you look at their VON indices for these withholdings, it's copy-paste language that largely reiterates the generic rule for B-7E, and it has no specific nexus to the exemption claimed. We also identified issues with the agencies withholdings under B-6 and B-7C. These exemptions focus on an individual privacy interest as balanced against a public interest. Domain names lack any sort of privacy interest. The agencies have failed to articulate any reasonable or plausible privacy interests that are attached to domain names, and they have a significant public interest as recognized by this court in LAR. The public interest is shutting light on the performance of an agency's statutory duties and otherwise letting its citizens know what its government is up to. And that's important here because domain names show which agencies were involved in critical decisions made related to Roxana and her death. So it's important that these domain names be released, and even the government realizes that these domain names lack a privacy interest and also are reasonably segregable because there are instances where the government redacted domain names and then other instances where they failed to redact domain names. You're under three minutes. Would you like to reserve? Yes, Your Honor. Thank you very much. We'll hear from the government. I think you're muted. I'm sorry, Your Honor. May it please the court, Laura Myron for the agencies. I'd like to begin with the reasonableness of the agency search, although I'd be happy to also address any questions the court may have with regard to the withholdings and redactions at issue here. I think it's helpful to give a brief rundown with the court's indulgence of the places that the agencies did search because it really underscores the district court's conclusion that the search was reasonably calculated to uncover responsive documents and that it was adequate for purposes of FOIA. When the FOIA request came in, the search agency began, especially ICE, began its search with the External Review and Analysis Unit, which is the entity that conducted the investigation following Ms. Hernandez's death. That office also contacted the field offices in San Diego and in El Paso, as well as the ICE Health Services Corps and the Enforcement and Removal Operations Custody Management Office. Plaintiffs submitted requests for searches in additional locations, and as part of an effort to refine the search in a way that was mutually agreeable to the parties, the agency also searched some additional offices, including the Office of the Director, the ICE FOIA office, the Office of Legal Advisor, and mostly generated duplicative documents, although some additional documents were produced. At that point, the plaintiffs came back and said, you know, we think that there are some documents missing related to the mortality review and the detainee death review. I searched again and did find a couple of documents that had been overlooked on an individual hard drive. But there are numerous places that the agency did search and that the district court credited as part of the search. It simply is not the case that plaintiffs directed the scope of the agency's search and that the agency would not have found any documents absent participation from… When CoreCivic turned up documents that hadn't been found, what did you do in response? Yes, Your Honor, so there are, as we understand it, some documents that plaintiffs identified that they believed should have been produced by ICE but were not. In response, the agency produced an affidavit, and this is in the supplemental excerpts of record at 82 to 84, explaining that most of those documents were, in fact, CoreCivic documents, that there were some documents that were, in fact, produced by ICE, and then admitted that there were, in fact, a few documents that had been overlooked. And that is something that was aired before the district court, that we've been upfront about before this court, that there are, in fact, a few documents that, you know, were overlooked as part of the search. But as this court has made very clear in its cases, including Hamdan and Lahr and Marks, the fact that a few documents may have been overlooked as part of a search does not render the search unreasonable or inadequate. As this court said in Hamdan, the plaintiffs are entitled to a reasonable search, not a perfect one. And this court, as well as the D.C. Circuit in Aitoralde and the Eighth Circuit in Miller, both of which have been cited by this court, has said that the fact that a few documents exist that did not – were not turned up in the search is not reason to believe that summary judgment is inadequate or that the search was itself inadequate. I appreciate – go ahead. No, no, go ahead. Well, I appreciate that because FOIA doesn't demand perfection because that would be probably impossible. And I appreciate that the agency looked in a lot of different locations. But the challenge that we have is not really that you looked in a lot of places. It's how that is benchmarked against the standards. So I want to go back to where I did start with the Center's counsel. They've argued for a beyond material doubt as the standard, and you've said it's beyond substantial doubt. So I'm interested to know what you think the difference is between those standards. And then secondly, it seems to me that in looking at the case law, the beyond substantial doubt is really only used in benchmarking summary judgment, not really looking at the adequacy of the search as the district court has to make that initial determination. So your thoughts on these standards and how they filter into the case would really help me. Certainly, Your Honor. I think the most important part in considering what standards should apply is what the standard modifies, and that is whether the search is reasonably calculated to turn up responsive documents. Even if you applied a beyond material doubt standard, which honestly I'm not sure is substantially different than a substantial doubt standard, that doesn't mean that the agencies or wouldn't mean, and certainly hasn't meant in other places like the D.C. Circuit from which plaintiffs derive the standard, hasn't meant that FOIA requesters are entitled to a search that turns up every document. In fact, I. Tiraldi, which is a case from the D.C. Circuit, expressly states that a search may be reasonably calculated to uncover responsive records and still miss some documents, and that's perfectly okay. So even if you were to refine the standard in that way, I don't think it would change the result in this case, and the district court certainly concluded applying the substantial doubt standard that the search was reasonably calculated to turn up responsive records, and it did turn up quite a number of records. I mean, the agencies produced almost 2,000 pages of documents in response to the request here, and I understand the plaintiffs have also pointed to some additional places they believe that the agency should have searched, and as this court has stated in cases like Lahr and Hamdan, the agencies are not required to run down every rabbit hole, even where there may be indication that other... Okay, well, in this case, there were things that weren't rabbit holes because a bunch of responsive documents were found, so once the agency figures out that there's another place, I don't understand why the agency just doesn't go to that place and produce those things. Well, if I could, I think that there are perhaps two things that the plaintiffs are suggesting should be conflated, but I think they're importantly separate. The first is whether the agency found additional documents when it searched places like the Office of the Director, the Office of Public Affairs, those places, and certainly it did, and those searches were accounted for in the district court's consideration of whether the search was reasonable. The question, I think, in the remedy, especially the question on remedy speaks to this, is whether the agency would be obligated to conduct additional searches at this point, and my point, Your Honor, was that they're not obligated at this point, given the search that has been conducted, to go down additional rabbit holes, and that's made very clear by this court's cases, including Hamdan and Lahr, in which plaintiffs had argued that additional leads were generated by the substance of the documents, and this court concluded that searches were nonetheless reasonable, notwithstanding that the agency hadn't followed every lead that may be generated by the substance of the documents. Can I ask something about the root cause analysis? It's the government's position that there wasn't one at all? Yes, Your Honor, and I'm glad you asked. I'd be happy to clarify. So a root cause analysis, and this is from page 187 of the record, a root cause analysis is conducted when an adverse event occurs at a DHS facility, on DHS property, or during field operations. Ms. Hernandez died at the hospital from complications of untreated HIV, and the root cause analysis helps to identify the causal factors in such an adverse event. So the agency confirmed that there was no root cause analysis conducted here. That follows from what a root cause analysis is intended to do. There was, and it is in the record, a mortality review and a detainee death review, and a mortality review, this is also from page 187 and the subsequent pages of the record, is conducted to determine the appropriateness of clinical care and effectiveness of facility policies relevant to the circumstances surrounding the death. You're going a little fast for me. Are you telling me that there was no root cause analysis because it was a death in a hospital? Yes, Your Honor. Okay. And you say there's a regulation or policy that shows that's how this works? Well, I believe it's a handbook, but it is referenced by plaintiffs at page 187 of the record, and that makes perfect sense that it would work that way given that a mortality review, which was conducted in this case, looks at the care that was provided to the individual as well as the facility policies and procedures relevant to the circumstances surrounding the death. So plaintiffs have suggested that there should be in the record additional documents that surround a root cause analysis, and my point in response is that that does not follow from what a root cause analysis, what purpose a root cause analysis serves. I was a little surprised by these redactions with respect to the email domains, which normally wouldn't be considered a privacy concern. You probably can guess, and you can look on the Internet and see what our domain names are, government.gov. Why were those withheld under 6 and 7? Certainly aren't. So this is in the record at 555 and 177. The domain names were withheld out of concern for the privacy interests of lower-level ICE and CRCL employees and the concern that, you know, if someone were to have the name of the individual, they would be able to put together the email address for that individual. You're confusing me. It's not hard to do. The problem is I thought you withheld domain names of subunits, not just of individual people, of sub-offices within the agencies. Is that not true? Well, I'm sorry. The domain names are withheld in the CC or to or from line of an email address. The whole email address is redacted. Plaintiffs are suggesting that we should unredact the domain name that follows, and, you know, we could leave redacted the... And why not? So as is in the record at the pages I mentioned, the agency expressed concern that individuals would be able to use the domain names to be able to figure out an email address belonging to a lower-level employee and be able to contact them in a way that would... How does that work? I mean, these are public officials that are working in a public agency that has a public domain name. And if your concern is as to the individual and you've redacted his or her name, I thought the argument made by the appellants here is that the agency or the fact that emails were going from agency X to Y and then on to Z or whatever, that that would show, you know, how the process was working and they weren't concerned about getting the specific individual's name. And so by raising the claim that somehow you're protecting the individual, you're basically submarining public information about which agencies touch this thing. So respectfully, Your Honor, the agencies did not redact any of the information in the signature block of the email that would include an office or title for any individuals. So there's lots of information that can be garnered from the record about what agencies were involved, what offices were involved, what, you know, potentially people were, you know, who knew what when, that kind of information. The redaction is applied to the email address. And as I've said, the agency has a concern that if that information were to be— Well, is that the only concern, that somehow through detective work that individuals would work backward and somehow discover, by applying that domain name to some other name, who that person was? Is that the gist of your argument? Yes, Your Honor, that's the interest that was articulated in the affidavits. And so what's the best case you have to support your position on that? Well, even in cases like Lahr and others, the court has recognized that individuals, especially low-level employees, have an interest in having their personal information, including email addresses, redacted. I get that. But do you have a single case that says that you can withhold the domain name? Well, no, Your Honor. I'm not sure that this court has considered that question directly. I mean, certainly it is— There is a district court decision from the District of D.C. that considers the question under Exemption 6, which has a lesser privacy standard than Exemption 7c, which was invoked here. And it is a balancing test. So it would be—plaintiffs would also need to articulate a public interest. And as I've mentioned, lots of information is available about the offices and who was involved in what email. So it's not clear that that would outweigh the privacy interest. I see I'm out of time. If I could just make one point in conclusion. As I've said, the agencies here are entitled to— it's a reasonable search, not a perfect one. And certainly that's what they've received. And it's not the case that they're entitled to run down every rabbit hole and whatnot. The redactions here were appropriate, as the district court recognized, and this court should affirm. Let me ask one more question. If I'm reading the record right, and you can correct me if I'm wrong, plaintiffs requested some or identified some 48 or close emails and asked you to search. And if I understand your answer correctly, it was, they haven't shown that we didn't produce. Did you search those email addresses? Well, I'm not sure I can answer that question directly, Your Honor. And partly that's because it's not actually a list of email addresses, and it's on page 431 and 432 of the record. It's a list of partial names. In the affidavit submitted by the agency, including on page 83 of the supplemental appendix, the agency did state that emails from those offices, including the El Paso field office and the San Diego field office, were collected. And certainly the record reflects that nearly a third of the documents that were produced to the plaintiffs are emails. So you didn't search? Well, again, I'm not sure that I can... I'm just asking yes or no. Did you search in response to the plaintiff's request or not? Well, in response to the plaintiff's specific request, the agency did not conduct additional searches. But that is because, as noted in the record, emails from the relevant offices had already been collected as part of the initial search. Thank you. We'll hear rebuttal. Thank you, Your Honors. I'd like to address two points on rebuttal, the first about the search adequacy, looking at the number of documents, and the second about the root cause analysis. With respect to the overlooked documents, the government continually focuses on, which the district court did as well, the number of overlooked documents, which is not the issue, and it misses the point. And what's at stake here is not document numbers. It's human lives and other human lives of asylum seekers in ISIS custody. As Your Honor has mentioned, there were 48 additional custodians that were identified that the government has neither confirmed nor denied that they searched. And as the government has just represented, the fact that those custodians showed up in other documents that they collected confuses the issue between a custodian, which is a search location, and a document collection, and further points to the fact that those are very highly relevant search locations because they are showing up in documents they already have collected. The government also relies on Hamdan and Lahr. Those are not applicable here. That's where requesters pointed merely to references of documents in documents already produced. Here we're showing new search locations that were not searched, and these are not partial. They are full email addresses, enterprise-level accounts that ISIS admits it did not search as well. Also, with respect to the root cause analysis, the government has not accurately represented what the root cause analysis guide requires. That's cited on our reply brief, pages 14 to 15. The root cause analysis does not support that because the event did not occur on the Department of Homeland Security's property, that they were not supposed to carry out this really important, critical document that investigates the root cause of Roxana's death. Actually, doesn't that confuse the issue whether they were or were not as separate from whether they have a document, correct? Yes, it's separate. What we are saying is not that they should have had a root cause analysis, but that the support to make a representation that no root cause analysis was created is woefully insufficient here. They don't identify who at ICE made this representation, if they have the appropriate title or authority to make that representation. I see I'm out of time, so I'll quickly summarize. The root cause analysis guide itself explains that it's the mere fact that For the reasons that we've articulated today and in our briefing, we respectfully request that this court reverse and remand the district court's finding. Thank you, Your Honors. Thank you. Thank you both for your arguments today. They were very helpful to the court, and the matter just argued will be submitted for decision. We'll proceed to questions.
judges: THOMAS, McKEOWN, Restani